UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                              :
   IN RE:,                                    :
                                              :      15md2645
                                              :      15mc2645
   KIND LLC "HEALTHY AND ALL                  :
   NATURAL" LITIGATION                        :
                                              :      OPINION & ORDER
                                              :
                                              :
   *This Document Relates to All Actions*.    :
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WILLIAM H. PAULEY III, Senior District Judge:

Plaintiffs bring this putative class action against KIND, LLC, alleging consumer protection and false advertising claims. They move for class certification. (ECF No. 168.) In addition to opposing Plaintiffs' motion, KIND counters with a Daubert motion seeking to exclude one of Plaintiffs' experts, (ECF No. 190), and separately objects to two expert reports submitted on reply, (ECF No. 211). For the reasons that follow, Plaintiffs' motion for class certification is granted in part and denied in part, KIND's Daubert motion is denied, and KIND's objections are granted in part and denied in part.

BACKGROUND

I.   This Action

This Court assumes familiarity with the facts of this case and addresses only those necessary to decide this motion. See In re KIND LLC "Healthy & All Natural" Litig., 209 F. Supp. 3d 689, 691 (S.D.N.Y. 2016). KIND markets and distributes the ubiquitous KIND bar that has become a staple of American checkout counters. In addition to these bars, KIND also sells bags of granola, dubbed "Healthy Grain Clusters." (See Amended Class Action Complaint, ECF No. 84 ("ACC"), ¶ 1.) These snack foods display a label that includes the words "All Natural"

and "Non-GMO."[1]  (ACC ¶ 1.)  Plaintiffs allege that KIND uses these descriptors to capitalize

on the highly profitable and fast-growing health food market.  (ACC ¶¶ 19–22.)  But despite

KIND's reliance on this advertising, Plaintiffs allege that the products do not live up to their

labels.  (ACC ¶ 2–3.)  Instead, Plaintiffs allege that KIND products contain a conglomeration of

chemically-synthesized and highly-processed ingredients.  (ACC ¶ 2–3.)  According to Plaintiffs,

these ingredients render KIND's labeling false and misleading based on the New Oxford

American Dictionary's definition of "natural" as "existing in or caused by nature; not made or

caused by humankind."  (ACC ¶ 40.)  Additionally, Plaintiffs allege that "[t]esting . . . detected

the presence of GMOs in at least some of the products," (ACC ¶ 33), and that "approximately

90% of canola, 89% of corn, and 94% of soybeans grown in the United States are genetically

modified," (ACC ¶ 48).

Plaintiffs seek damages under New York's General Business Law ("GBL") § 349;

California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, et seq., Unfair

Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., and False Advertising Law

("FAL"), Cal. Bus. & Prof. Code § 17500, et seq.; and Florida's Deceptive and Unfair Trade

Practices Act ("FDUTPA") Fla. Sta. § 501.201, et seq.  Additionally, Plaintiffs seek to enjoin

KIND from continuing to use this allegedly deceptive advertising.

II.     The Product Labels

Plaintiffs take issue with the labels on 39 KIND products.  Each of these labels

displays a litany of health-related characteristics.  These include—in addition to some variation

of the "All Natural / Non-GMO," "Non-GMO," and "No Genetically Engineered Ingredients"—

advertisements that the products are gluten free, low glycemic, very low sodium, and contain no

---

[1]        "Non-GMO" is defined as "organisms in which the genetic material (DNA) has been altered in a way that
does not occur naturally."  (ACC ¶ 2 (citing the World Health Organization).)

trans-fat.  (See generally Decl. of Elle Lanning in Opp'n to Class Certification, ECF No. 184 ("Lanning Decl."), Ex C.)  Additionally, the KIND packaging features a window, so that potential consumers can see the bar itself.  Because a picture is worth a thousand words, three representative labels are depicted as follows:

All Natural / Non-GMO



(Lanning Decl. Ex. C, at 1.)[2]

---

2    These packaging labels are for KIND Core bars.  (See Lanning Decl. ¶ 19.)  The pink rectangles on the labels denote clear plastic so that consumers can see the bar.

3

Non-GMO



(Lanning Decl. Ex. C, at 2.)

<u>No Genetically Engineered Ingredients</u>



(Lanning Decl. Ex. C, at 3.)  As demonstrated by these labels, KIND cycled through three

different variations during the putative class period: "All Natural / Non-GMO," "Non-GMO,"

and "No Genetically Engineered Ingredients."

While KIND started with "All Natural / Non-GMO" on most of its products,

KIND began removing the "All Natural" advertisement through a staggered change from 2014 to

2017.  The majority of products at issue had the "All Natural" label removed by June 2015,

though several displayed the label until 2017.  Notably, while the "All Natural" label was present

on the packaging, it was on the same line as "Non-GMO" and read as "All Natural / Non-GMO."

(See, e.g., Lanning Decl. Ex. D, at 1.)  On a rolling basis across the products from October 2015

to January 2016, KIND changed many of the labels from "Non-GMO" to "No Genetically

Engineered Ingredients."  The figures below set forth a timeline of KIND's label changes for

each of the products at issue:





(Lanning Decl. Ex. A.)

III.   The Product's Ingredients

      Plaintiffs allege that despite these advertisements, the products at issue contain both synthetic and GMO ingredients.  These include soy lecithin, soy protein isolate, citris pectin, glucose syrup/Non-GMO glucose, vegetable glycerine, palm kernel oil, canola oil, ascorbic acid, vitamin A Acetate, D-Alpha Tocopheryl Acetate, and annatto.  (See ACC ¶ 49.)

      The challenged ingredients vary among the relevant products.  Many contain multiple challenged ingredients, while others contain just one.

IV.   Class Certification

      Plaintiffs seek certification of three Rule 23(b)(3) damages classes:[3]

1.      All persons who purchased KIND's Products in New York for their personal use and not for resale at any time since April 17, 2009[4] (the "New York Class");

2.      All persons who purchased KIND's Products in California for their personal use and not for resale at any time since April 17, 2011 (the "California Class"); and

3.      All persons who purchased KIND's Products in Florida for their personal use and not for resale at any time since April 17, 2011 (the "Florida Class").

Plaintiffs also seek certification of injunctive classes pursuant to Rule 23(b)(2).  Additionally, Plaintiffs seek the following Class Representative appointments:

---

[3]     While Plaintiffs initially sought to certify a nationwide class, they have since withdrawn that application. (See July 2, 2020 Oral Arg. Tr. ("Arg. Tr."), at 5:13–16.)

[4]     The New York Class period is longer due to New York's statute of limitation.  (See Arg. Tr., at 5:6–12.)

1.      Amanda Short and Sarah Thomas as the class representatives for the New York Class;

2.      Charity Bustamante as the class representative for the California Class;

3.      Elizabeth Livingston as the class representative for the Florida Class.

Finally, Plaintiffs ask this Court appoint Pearson, Simon, & Warshaw, LLP; Finkelstein, Blankinship, Frei-Pearson & Garber, LLP; and Ahdoot & Wolfson, PC as Class Counsel under Rule 23(g).

DISCUSSION

I.   Legal Standard

When considering a class certification motion, courts accept the allegations in the complaint as true.  See Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661 n.15 (2d Cir. 1978) ("[I]t is proper to accept the complaint allegations as true in a class certification motion.").  However, a court may also consider material outside the pleadings.  See Kaczmarek v. Int'l Bus. Machs. Corp., 186 F.R.D. 307, 311 (S.D.N.Y. 1999) (citing Sirota v. Solitron Devices, Inc., 673 F.2d 566, 571 (2d Cir. 1982)).  "Nonetheless, resolution of a class certification motion should not become a preliminary inquiry into the merits of the case.  In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met."  In re Currency Conversion Fee Antitrust Litig., 230 F.R.D. 303, 307 (S.D.N.Y. 2004) (quotation marks omitted).  Specifically, courts are not granted a "license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to an extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  Amgen, Inc. v. Conn. Ret. Plans and Tr. Funds, 568 U.S. 455, 466 (2013).

But Rule 23 is more than "a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011). As such, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." Dukes, 564 U.S. at 350 (quotation marks omitted). "The party seeking class certification bears the burden of establishing" Rule 23's requirements "by a preponderance of the evidence." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010); see also Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 807 (2011). And a class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982). "[F]ailure to prove any element [of Rule 23] precludes certification." Ansari v. N.Y. Univ., 179 F.R.D. 112, 114 (S.D.N.Y. 1998).

The Second Circuit instructs district courts "to adopt a liberal interpretation of Rule 23 in order to maximize the benefits to both private parties and to the public provided by class actions." In re MF Global Holdings Ltd. Inv. Litig., 310 F.R.D. 230, 235 (S.D.N.Y. 2015). Accordingly, "if there is to be an error made, let it be in favor and not against the maintenance of the class action, for it is always subject to modification should later developments during the course of the trial so require." Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968); accord In re Facebook, Inc., IPO Sec. & Derivative Litig., 312 F.R.D. 332, 340 (S.D.N.Y. 2015). Ultimately, "[t]rial courts are given substantial discretion in determining whether to grant class certification." In re MF Global, 310 F.R.D. at 235; accord Myers, 624 F.3d at 547.

Rule 23(a) imposes four requirements for class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. See Fed. R. Civ. P. 23(a). The Second Circuit has also recognized that Rule 23(a) contains an "implied requirement of ascertainability." Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015); see also Gruber v. Gilbertson,

2019 WL 4439415, at *2 n.2 (S.D.N.Y. Sept. 17, 2019) (same).  Further, Rule 23(b)(3) requires

that "questions of law or fact common to class members predominate over any questions

affecting only class members," making a class action "superior to other available methods for

fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

II.     Rule 23(a) Requirements

     a.     Numerosity

To satisfy the numerosity requirement, Plaintiffs must show that "the class is so

numerous that joinder of all members is impracticable."  See Fed. R. Civ. P. 23(a)(1).

"[I]mpracticable" does not mean "impossible," and a precise enumeration or identification of

class members is not required.  Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993).

"Numerosity is presumed for classes larger than forty members."  Pa. Pub. Sch. Emps.' Ret. Sys.

v. Morgan Stanley & Co. ("PPSERS"), 772 F.3d 111, 120 (2d Cir. 2014); see also Dial Corp. v.

News Corp., 314 F.R.D. 108, 113 (S.D.N.Y. 2015), amended, 2016 WL 690895 (S.D.N.Y. Feb.

9, 2016) (same).  "However, the numerosity inquiry is not strictly mathematical but must take

into account the context of the particular case, in particular whether a class is superior to joinder

based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii)

the financial resources of class members, (iv) their ability to sue separately, and (v) requests for

injunctive relief that would involve future class members."  PPSERS, 772 F.3d at 120.

KIND does not contest numerosity for obvious reasons.  Plaintiffs allege that

annual sales of the products at issue total in the hundreds of millions of dollars.  (See ACC ¶ 11.)

Because the products are relatively inexpensive, the proposed class undoubtedly comprises

millions of consumers.  Accordingly, numerosity is satisfied.

b.   <u>Commonality</u>

Commonality requires "questions of law or fact common to the class."  Fed. R.

Civ. P. 23(a)(2).  Courts have described this requirement as a "low hurdle."  <u>Kaplan v. S.A.C.</u>

<u>Capital Advisors, L.P.</u>, 311 F.R.D. 373, 378 (S.D.N.Y. 2015).  Plaintiffs' "claims must depend

upon a common contention," that "must be of such a nature that it is capable of classwide

resolution—which means that determination of its truth or falsity will resolve an issue that is

central to the validity of each one of the claims in one stroke."  <u>Dukes</u>, 564 U.S. at 350.  Thus,

the question is not whether common questions exist, but whether "the classwide proceeding [can]

generate common <u>answers</u> apt to drive the resolution of litigation."  <u>Dukes</u>, 564 U.S. at 350

(emphasis in original) (quotation marks omitted).  Because "the predominance criterion is far

more demanding" than commonality, "Rule 23(a)(2)'s 'commonality' requirement is subsumed

under, or superseded by, the more stringent Rule 23(b)(3) [predominance] requirement,"

<u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 609, 624 (1997).  Accordingly, commonality is

not generally a primary focus in class certification.

Here, there are questions common to the class capable of resolution through

common proof.  Plaintiffs argue that the fraudulent advertising is the same across the products.

Resolution of this question will be the same for the class.  Plaintiffs aver that they paid a

premium for KIND products under the allegedly mistaken belief that they were "All Natural"

and "Non-GMO."  Whether a premium was paid is also a question that can be determined for the

entire class.  "[F]raud claims based on uniform misrepresentations to all members of a class 'are

appropriate subjects for class certification' because, unlike fraud claims in which there are

material variations in the misrepresentations made to each class member, uniform

misrepresentations create "no need for a series of mini-trials."  <u>In re U.S. Foodservice Inc.</u>

Pricing Litig., 729 F.3d 108, 118 (2d Cir. 2013) (quoting Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002)).  This question alone is sufficient for commonality.  See Dukes, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2) [e]ven a single [common] question will do." (quotation marks omitted) (alterations in original)); see also In re Virtus Inv. Partners, Inc. Sec. Litig., 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) ("Courts in this Circuit find commonality satisfied where there are common issues relating to . . . misrepresentations of material fact . . . and damages.").  As such, the commonality requirement is met.

      c.   Typicality

Typicality "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"  Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)).  The standard is "not demanding," Kaplan, 311 F.R.D. at 379, because "the claims only need to share the same essential characteristics, and need not be identical," Dial Corp., 314 F.R.D. at 113.  "The commonality and typicality requirements tend to merge into one another."  Marisol, 126 F.3d at 376.  "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding."  Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002).  "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact

patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936–37 (2d Cir. 1993).

KIND advances several arguments as to why the class representatives are not typical of the class.  First, KIND argues that the class representatives have not purchased KIND bars since 2015.  Due to the evolution of the three challenged labels, KIND avers that the class representatives' arguments will not be similar to the rest of the class.  This argument is unavailing.

By 2015, all three challenged labels were in circulation and Plaintiffs purchased them.  Even if a named Plaintiff did not see all of the label variants, the typicality requirement would still be met.  See, e.g., Dial Corp., 314 F.R.D. at 114 (rejecting defendant's argument that because named plaintiffs did not purchase over the last years of the class period defeats typicality because "[d]ifferences in amounts or characteristics of the class representatives' purchases do not defeat typicality"); In re Sumitomo Copper Litig., 182 F.R.D. 85, 94 (S.D.N.Y. 1998) ("[T]he simple fact that Class members may have purchased and sold copper futures at different times, for different purposes" does not defeat typicality.).  Moreover, "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 936–37.  Here, there are only three variations of the labeling at issue.  The differences are slight and all can be litigated in this action with the current class representatives.

KIND also argues that none of the named plaintiffs purchased any of the Healthy Grains Clusters.  But KIND fails to articulate how this is relevant to typicality.  The Healthy Grains Clusters, like the other products, exhibited one of the three labels at issue—depending on

the purchase date.  The Healthy Grain Clusters contained ingredients that Plaintiffs allege are not

"natural" or are GMO.  Resolution of whether the other products' advertising was deceptive will

answer the question of whether the Healthy Grains Clusters' advertising was deceptive.

Accordingly, typicality is met.

     d.  Adequacy

        The final delineated Rule 23(a) requirement is that "the representative parties will

fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  This analysis

entails two factors: (1) the interests of the named plaintiffs cannot be antagonistic to those of the

remainder of the class and (2) class counsel must be qualified, experienced, and generally able to

conduct the litigation.  See In re Flag Telecom Holdings, Ltd. Secs. Litig, 574 F.3d 29, 35 (2d

Cir. 2009); Heredia v. Americare, Inc., 2018 WL 2332068, at *3 (S.D.N.Y. May 23, 2018).

        KIND does not contest adequacy.  With respect to the first prong, "[t]he focus is

on uncovering conflicts of interest between named parties and the class they seek to represent.

In order to defeat a motion for certification, however, [a] conflict must be fundamental."  In re

Flag Telecom Holdings, 574 F.3d at 35 (quotation marks and citation omitted).  Moreover, "[t]he

fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not

antagonistic to those of the class."  Dial Corp., 314 F.R.D. at 114.  With respect to the second

prong, Plaintiffs' counsel has demonstrated that they are qualified, experienced, and able to

conduct the litigation.  Thus, adequacy is met.

     e.  Ascertainability

        The Second Circuit has "recognized an implied requirement of ascertainability in

Rule 23, which demands that a class be sufficiently definite so that it is administratively feasible

for the court to determine whether a particular individual is a member."  In re Petrobras Sec., 862

F.3d 250, 260 (2d Cir. 2017) (quotation marks omitted).  This factor requires that "the identity of class members must be reasonably ascertainable by reference to objective criteria."  Ebin v. Kangadis Food Inc., 297 F.R.D. 561, 566 (S.D.N.Y. 2014).  "The standard for ascertainability is not demanding and is designed only to prevent the certification of a class whose membership is truly indeterminable."  Ebin, 297 F.R.D. at 567.  In other words, Plaintiffs must demonstrate the ability to identify individuals who purchased the products at issue over the class period and employ a reasonable method to prove their purchase and ownership of those products.  Hart v. BHH, LLC, 2017 WL 2912519, at *6 (S.D.N.Y. July 7, 2017).

Plaintiffs' proposed classes on their face appear ascertainable.  Plaintiffs fashion three classes—separated by the jurisdiction in which the products were purchased—over delineated class periods.  The proposed classes include anyone who purchased one of 39 KIND products that Plaintiffs allege contain false advertising.

In response, KIND asserts that the three different labeling variants are sufficient to defeat class certification.  KIND relies primarily on a Southern District of Florida decision to argue that the class is not ascertainable.  There, the district court declined to certify the class because only four of the nine variations of Crisco oil contained the challenged statement. Randolph v. J.M. Smucker Co., 303 F.R.D. 679, 687 (S.D. Fla. 2014).  The district court opined that "the likelihood that an individual would recall not only which specific kind of oil, but also, when that oil was purchased, complicates identification of the putative class."  Randolph, 303 F.R.D. at 687.  Moreover, the district court noted three issues: (1) "variations in Crisco products," some of which did not contain the allegedly deceptive advertising; (2) "the fact that the challenged product is a low-priced consumer item, of which the normal consumer likely does not retain significant memory about;" and (3) that "Crisco oil is intended to be an additive

ingredient to a final product, rather than a final product directly consumed by the user."
Randolph, 303 F.R.D. at 689.  This led the district court to find that the class was not
ascertainable because "the likelihood of a potential class member being able to accurately
identify themselves as a purchaser of the allegedly deceptive product, [was] slim."  Randolph,
303 F.R.D. at 689.

   However, the case at hand is distinguishable.  While KIND labels varied, all the
labeling over the putative class period is allegedly deceptive.  As such, the possibility that a
potential class member could join the litigation without ever seeing the allegedly deceptive
advertising cannot occur here.  All potential members in Plaintiffs' proposed classes would have
seen at least one variation of the allegedly deceptive advertising.

   Moreover, KIND takes issue with the fact that Plaintiffs' proposed class structure
does not require class members to provide receipts as proof of purchase.  Courts in this District
have disagreed as to whether a class can be ascertainable if there is no requirement that potential
class members provide receipts.  Compare, e.g., Ebin, 297 F.R.D. at 567 (finding a class of olive
oil purchasers was ascertainable although plaintiffs are unlikely to have retained receipts), with
Weiner v. Snapple Beverage Corp., 2010 WL 3119452, at *12–13 (S.D.N.Y. Aug. 5, 2010)
(declining to certify a class of Snapple purchasers because plaintiffs "offer[ed] no basis to find
that putative class members will have retained a receipt, bottle label, or any other concrete
documentation of their purchases").

   Notably, this Court has already determined that the lack of a receipt requirement
is not fatal to a class action.  See Hart, 2017 WL 2912519, at *7 (S.D.N.Y. July 7, 2017) ("[T]he
absence of a receipt is not fatal to Plaintiffs' task of demonstrating ascertainability.").  One
potential issue, however, is that this Court relied—in part—on the fact that "the decision to allow

use of a self-identification method turns on whether the alleged misrepresentation was uniform across all products." Hart, 2017 WL 2912519, at *7 (quotation marks omitted).  While here, there are three variants of allegedly deceptive advertising, this Court is not drawing a distinction among these advertisements.  Because "All Natural / Non-GMO," "Non-GMO," "No Genetically Engineered Ingredients" are functionally equivalent, this Court does not need to centrifuge class members into sub-classes.

Moreover, there are ample reasons for courts to certify a class without requiring members to provide a receipt.  Imposing a receipt requirement would severely constrict consumer class actions where most consumers do not keep receipts because the purchase price is low and part of a minerun retail transaction.  See In re Scotts EZ Seed Litig., 304 F.R.D. 397, 407 (S.D.N.Y. 2015) ("If proof of purchase was required to satisfy the ascertainability requirement, there would be no such thing as a consumer class action, especially with respect to low-cost products." (quotation marks omitted)).  Under such a rule, KIND—and every other manufacturer and distributer of consumables—could escape liability.  Moreover, the Second Circuit has instructed that "failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule." In re Visa Check/MasterMoney Antitrust Litig., 280 F.3d 124, 140 (2d Cir. 2001).  Accordingly, this Court determines that the classes are ascertainable.

III.   Rule 23(b)(3)

When Rule 23(a) is satisfied, a class may be certified under Rule 23(b)(3) if the court finds "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

17

a.  Predominance

Rule 23(b)(3) requires only "a showing that questions common to the class

predominate, not that those questions will be answered, on the merits, in favor of the class."

Amgen, 568 U.S. at 459 (emphasis in original).  A district court has a "duty to take a close look

at whether common questions predominate over individual ones."  Comcast Corp. v. Behrend,

569 U.S. 27, 34 (2013) (quotation marks omitted).  "Class-wide issues predominate if resolution

of some of the legal or factual questions that qualify each class member's case as a genuine

controversy can be achieved through generalized proof, and if these particular issues are more

substantial than the issues subject only to individualized proof."  Moore, 306 F.3d at 1252;

accord Brown v. Kelly, 609 F.3d 467, 483 (2d Cir. 2010).  "An individual question is one where

members of a proposed class will need to present evidence that varies from member to member,

while a common question is one where the same evidence will suffice for each member to make

a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  Tyson

Foods, Inc. v. Bouaphakeo, 136 S. Ct. 1036, 1045 (2016) (quotation marks omitted) (alteration in

original).

The inquiry "tests whether proposed classes are sufficiently cohesive to warrant

adjudication by representation" and "is a test readily met in certain cases alleging consumer or

securities fraud or violations of the antitrust laws."  Amchem Prod., Inc. v. Windsor, 521 U.S.

591, 623, 625 (1997) (emphasis added).  "[A] court's inquiry is directed primarily toward

whether the issue of liability is common to members of the class, taking into account both

affirmative claims and potential defenses."  Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase

& Co., 301 F.R.D. 116, 136 (S.D.N.Y. 2014).  Finally, "[w]hen one or more of the central issues

in the action are common to the class and can be said to predominate, the action may be

considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." Tyson Foods, 136 S. Ct. at 1045.  "[A] court examining predominance must assess (1) the elements of the claims and defenses to be litigated; and (2) whether generalized evidence could be offered to prove those elements on a class-wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief." Johnson v. Nextel Commc'ns Inc., 780 F.3d 128, 138 (2d Cir. 2015) (quotation marks omitted); see also Gruber, 2019 WL 4439415, at *6 (S.D.N.Y. Sept. 17, 2019) ("The predominance inquiry begins 'with the elements of the underlying cause of action.'" (quoting Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011))).

       i.  The Elements of Plaintiffs' Claims

          1.  The New York Class

For the New York Class, the General Business Law ("GBL") provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."  N.Y. Gen. Bus. L. § 349. "Generally, claims under [§ 349] are available to an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising." Small v. Lorillard Tobacco Co., 720 N.E.2d 892, 897 (N.Y. 1999).

To establish a prima facie case under GBL § 349, "a plaintiff must demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000).  Materiality under § 349 of the GBL is an objective inquiry; a deceptive act is defined as one "likely to mislead a reasonable consumer acting reasonably under

the circumstances." Maurizio, 230 F.3d at 521.  The same analysis applies to false advertising claims brought under § 350.  Maurizio, 230 F.3d at 521; see also Goshen v. Mut. Life Ins. Co. of N.Y., 774 N.E.2d 1190 (N.Y. 2002).

## 2.   The California Class

For the proposed California class, claims brought under the Unfair Competition Law ("UCL"), False Advertising Law ("FAL"), and Consumer Legal Remedies Act ("CLRA") "are governed by the 'reasonable consumer' test."  Williams v. Gerber Prods. Co., 552 F.3d 934, 938 (9th Cir. 2008).  "Under the reasonable consumer standard, [plaintiffs] must show that members of the public are likely to be deceived."  Williams, 552 F.3d at 938 (quotation marks omitted).

Relief under the UCL, FAL, and CLRA is available without individualized proof of "reliance and injury, so long as the named plaintiffs demonstrate injury and causation."  Guido v. L'Oreal, USA, Inc., 284 F.R.D. 468, 482 (C.D. Cal. 2012).  "A presumption, or at least an inference, of reliance arises under the UCL and FAL whenever there is a showing that a misrepresentation was material."  McCrary v. Elations Co., 2014 WL 1779243, at *14 (C.D. Cal. Jan. 13, 2014) (alteration omitted).  Similarly, causation is not a barrier to class certification under the CLRA.  Guido, 284 F.R.D. at 482 (quoting Mass. Mut. Life Ins. Co. v. Superior Ct., 119 Cal. Rptr. 2d 190, 197 (Cal. Ct. App. 2002)).  The objective test for materiality and thus reliance "renders claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' individual interaction with the product."  Tait v. BSH Home Appliances Corp., 289 F.R.D. 466, 480 (C.D. Cal. 2012) (quotation marks omitted); accord In re Scotts, 304 F.R.D. at 410.

3.  <u>The Florida Class</u>

For the Florida Class, Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") employs a similar framework as New York and California for false and deceptive advertising claims.  "A claim under FDUTPA has three elements: (1) a deceptive or unfair practice; (2) causation; and (3) actual damages."  <u>Siever v. BWGaskets, Inc.</u>, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009).  FDUTPA employs a "hybrid standard," which can be "objectively established as to mindset but subjectively established as to context."  <u>In re Motions to Certify Classes Against Court Reporting Firms for Charges Relating to Word Indices</u>, 715 F. Supp. 2d 1265, 1282 (S.D. Fla. 2010), <u>aff'd sub nom.</u> <u>Webber v. Esquire Deposition Servs., LLC</u>, 439 F. App'x 849, 851 (11th Cir. 2011).  However, this hybrid standard still allows for courts to analyze "packaging as a group," <u>Goldemberg v. Johnson & Johnson Consumer Cos.</u>, 317 F.R.D. 374, 390 (S.D.N.Y. 2016), and courts can certify classes based on FDUTPA claims if class-wide proof is available, <u>Fitzpatrick v. Gen. Mills, Inc.</u>, 635 F.3d 1279, 1283 (11th Cir. 2011).

Plaintiffs do not need to establish causation on an individual basis.  Rather, they need only show that a reasonable consumer would have been deceived.  <u>See</u> <u>Davis v. Powertel, Inc.</u>, 776 So. 2d 971, 974 (Fla. Dist. Ct. App. 2000) ("[T]he question is not whether the plaintiff actually relied on the alleged deceptive trade practice, but whether the practice was likely to deceive a consumer acting reasonably in the same circumstances.").

* * *

While there are nuances among the New York, California, and Florida consumer protection statutes, broadly speaking, they all contain the same three elements.  Thus, in order to determine if common issues predominate, this Court must focus on (1) the deceptive act, (2) materiality, and (3) injury.

ii.   Deceptive Act and Materiality

Due to the interrelationship between a deceptive act and materiality, this Court analyzes the first two elements together.

1.   The Labels

Plaintiffs argue that there are common issues that predominate the deceptive act and materiality elements.  Plaintiffs point to the "All Natural / Non-GMO," "Non-GMO," and "No Genetically Engineered Ingredients" labeling, which KIND placed prominently on its products throughout the proposed class period.  KIND counters that Plaintiffs were not exposed to the same marketing because the labeling differed over time and across products.  Namely, KIND cycled through the "All Natural / Non-GMO," "Non-GMO," and "No Genetically Engineered Ingredients" labels.

Nevertheless, common questions predominate.  To begin, this Court notes the extreme similarity between the three labels.  First, there is little practical difference among "Non-GMO," and "No Genetically Engineered Ingredients."  "The World Health Organization defines [GMOs] as 'organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally.'"  (ACC ¶ 2.)  This is the same as an ingredient that has been genetically engineered.  Second, the differences between "Non-GMO" and "No Genetically Engineered Ingredients" on one hand, and "All Natural" on the other, are minute.  "Natural" can be defined as "existing in or caused by nature; not made or caused by humankind."  (ACC ¶ 39 (quoting New Oxford American Dictionary 1167 (3d ed. 2010)).)  If a product contains a GMO, it by definition cannot be natural.  Third, none of the labels displayed "All Natural" on its own.  Rather, KIND coupled "All Natural" with "Non-GMO."  Finally, whether "All Natural" and "Non-GMO" labels on a product are accurate is a binary question: either it's true or it isn't.  And

importantly, the answer to this question will be the same for each of the named Plaintiffs and every person who purchased a KIND bar during the class period.  See In re Scotts, 304 F.R.D. at 408 ("Generalized proof will determine whether the 50% thicker claim was false or misleading under both New York and California law.").  As such, while there is variance in the labels at issue, common questions as to whether these labels are deceptive predominate.

This same reasoning extends to materiality as well.  KIND argues that Plaintiffs are unable to show that the label would mislead a reasonable customer.  But this argument largely misses the mark at this stage.  The operative issue on class certification is whether the question of materiality predominates, not whether Plaintiffs' answer is correct.  Put differently, this Court looks to whether a determination that the labels are materially misleading would be the same for the entire class.  See Amgen Inc., 568 U.S. at 468 ("[U]nder the plain language of Rule 23(b)(3), plaintiffs are not required to prove materiality at the class-certification stage.").

Both Plaintiffs and KIND proffer experts who each—unsurprisingly—posit diametrically opposite conclusions over the materiality of the labels.  (See ECF Nos. 183, 208.) However, materiality not the question for class certification.  The question here is whether materiality can be determined on a classwide basis.  The answer is obviously yes.

Other courts in this district have come to the same conclusion.  In In re Scotts, the court held that "[c]lasswide evidence will be used to establish whether [defendant]'s labeling of EZ Seed was false, and if so, whether it was likely to mislead a reasonable consumer acting reasonably under the circumstances."  In re Scotts, 304 F.R.D. at 409; see also Goldemberg, 317 F.R.D. at 389 ("[T]he potentially common question of whether a given product's advertising set . . . is misleading can be measured under an objective standard: whether it was 'likely to have misle[d] a reasonable consumer acting reasonably under the circumstances.'" (quoting Oswego

Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A., 647 N.E.2d 741 (N.Y. 1995))).

Like the plaintiffs in In re Scotts and Goldemberg, Plaintiffs here assert that they "paid a

premium for [the product] based on the false . . . claim," which will be determined by "classwide

evidence."  In re Scotts, 304 F.R.D. at 409.

   The product specific labeling and packaging claims do not require proof as to

individual understandings and can be judged based on an objective standard.  Generalized proof

as to what message the packaging conveys will satisfy the inquiry.  See, e.g., Belfiore v. Procter

& Gamble Co., 311 F.R.D. 29, 69 (E.D.N.Y. 2015) (what "flushable" meant and whether a

product was "flushable" presented common questions that predominated); Guido v. L'Oreal,

USA, Inc., 2013 WL 3353857, at *12 (C.D. Cal. July 1, 2013) ("[W]hether a reasonable

consumer would have been deceived by [a product's] packaging is an objective inquiry that

focuses on that packaging.  Common questions therefore predominate regarding [the producer's]

liability under the New York consumer protection statutes.").  Indeed, this action presents the

more straightforward case of establishing that a label presents a provably false claim.  Cf., e.g.,

In re Scotts, 304 F.R.D. at 409 (misleading nature of "50% thicker claim" presented a common

question answerable by generalized proof).

   In opposition, KIND relies on a number of cases where courts declined to certify

consumer classes on the basis that the labeling was not uniform.  KIND points to its three

labeling variations to argue that, likewise, its labeling was not uniform and, as a result, questions

of materiality do not predominate.  However, each of their authorities is distinguishable.  KIND

first relies on Ault v. J.M. Smucker Co., 310 F.R.D. 59, 65 (S.D.N.Y. 2015) and Weiner.  But in

these cases, only a small number of the products contained any misleading labeling while the rest

were unchallenged.  Due to the morphing of product labeling over time and among products,

potential class members in these cases would be required to remember what specific product they purchased up to six years earlier.  See Ault, 310 F.R.D. at 65–66 ("[T]he number of Crisco cooking oil brands—some with the 'All Natural' label, some without—plus the differing class periods," defeats class certification.).  By contrast, all of KIND's products contain some form of allegedly misleading advertising, albeit in slight variations.  As long as potential class members purchased one of the products at issue during the proposed class period, they were exposed to allegedly deceptive advertising.

KIND also cites Goldemberg to argue that varied advertising can defeat class certification.  317 F.R.D. at 389.  There, the court certified certain classes but not others.  Specifically, the court declined to certify a class based on advertisements seen on company's website or Facebook page because "different proof [would] be required for each of the products" and "each advertisement would need to be considered for the context in which [it] was used and the product or products to which it related."  Goldemberg, 317 F.R.D. at 388.  However, the court did certify classes based on the labeling and packaging claims because they "[did] not require proof as to individual understandings and [could] be judged based on the objective standard provided."  Goldemberg, 317 F.R.D. at 389.  The claims here are more analogous to the classes the Goldemberg court certified as opposed to the classes it did not.  The allegedly false advertising appeared on the packaging, so this Court will not be required to ascertain the context of the advertisement or the product to which it applied.

Nor is KIND's reliance on Marotto v. Kellogg Co. persuasive.  2020 WL 509035 (S.D.N.Y. Jan. 31, 2020).  There, the court rejected class certification because "[d]efendants released twenty different Pringles labels during the putative class period, only four of which

contain[ed] the offending 'No Artificial Flavors' text."  Marotto, 2020 WL 509035, at *8.  Here, all KIND products contained the allegedly deceptive labels.

This Court is only aware of a single decision that presents somewhat analogous facts.  In In re Tropicana Orange Juice Marketing & Sales Practices Litigation, the products' labeling varied wildly, including "'100% pure and natural orange juice,' '100% pure,' '100% natural,' '100% juice,' 'fresh,' 'grove to glass,' 'squeezed from fresh oranges,' 'straight-from-the-orange,' . . . 'natural,' 'pure,' '100% pure orange juice,' '100% pure Florida orange juice,' and '100% orange juice.'"  2019 WL 2521958, at *8 (D.N.J. June 18, 2019).  While plaintiffs there argued that the purpose of the labels was to convey that the product was "100% pure orange juice with nothing added to it," the court held that the differences between each of the 13 definitions would "require[ the court] to perform an individualized inquiry into each product purchased to determine what combinations of labels were visible before determining whether that combination is deceiving to a reasonable consumer."  In re Tropicana, 2019 WL 2521958, at *9, 10.  However, this Court is not faced with as many different iterations of labels; rather, here, there are only three—two of which are virtually identical.

KIND also argues that Plaintiffs do not have a unified theory as to what "All Natural" means.  As such, KIND avers that it is impossible for common questions to predominate when Plaintiffs cannot formulate a definition for the term "All Natural."  While KIND is correct that the Amended Consolidated Complaint advances five different definitions of "natural," none of these definitions contradict the others.  Plaintiffs offer the New Oxford American Dictionary definition, (ACC ¶ 39 ("existing in or caused by nature; not made or caused by humankind")), the FDA's policy, see 58 C.F.R. §§ 2302, 2407, (ACC ¶ 41 (defining the outer boundaries of the use of the term "natural" as "meaning that nothing artificial or synthetic

(including all color activities regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food")), the USDA's definition, (ACC ¶¶ 43–45 ("(1) the product does not contain any artificial flavor or flavorings, color ingredient, or chemical preservatives . . . or any other artificial or synthetic ingredient, and (2) the product and its ingredients are not more than minimally processed" (alteration in original))), and Congress's definition, 7 U.S.C. § 6502(21)–(22), (ACC ¶ 46 ("defin[ing] synthetic to mean a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes" (quotation marks omitted))).  While these formulations of the definition "natural" differ, none excludes another.

   In reaching its conclusion that common issues predominate, this Court is also guided by important policy considerations.  This consumer class action spins a familiar tale.  A large company produces similar products with different labels.  Should employing slightly different labels allow a company to escape liability?  Here, KIND makes a number of health bars and granola clusters in a variety of flavors.  The labels on these products vary slightly but all are sufficiently similar to draw potential customers to the KIND brand.  Moreover, as every company does, KIND refined its advertising strategy with the passage of time and market research, resulting in gradual changes to its labeling.  However, one can imagine that the same scenario plays out in every consumer-products company.  If this Court declined to certify the proposed classes, consumer-product companies would have a roadmap to avoid class actions.  And given the relative low cost of most consumer products, those companies could avoid any liability for deceptive labeling.

2.   Challenged Ingredients

In addition to materially misleading labeling, Plaintiffs allege that KIND products contain ingredients that are not "All Natural" and "Non-GMO."

In opposition, KIND posits that the number of ingredients that Plaintiffs challenge as non-natural means that common issues do not predominate.  However, Plaintiffs were not required to challenge a litany of ingredients.  The terms "All Natural" and "Non-GMO" are absolute.  If a product contains a single non-natural or GMO ingredient, the label is incorrect.  Thus, if Plaintiffs identify one ingredient that a jury finds to be non-natural, they may be entitled to damages.  And the fact that a single non-natural or non-GMO ingredient is found in dozens but not necessarily all KIND products does not impair predominance.  As long as each product has at least one non-natural ingredient, that determination answers the question for all members of the putative class.  Indeed, all of the products contain one of three challenged ingredients—soy lecithin, D-Alpha Tocopheryl Acetate / Vitamin E, or Non-GMO glucose—in addition to a myriad of other allegedly non-natural ingredients.  (See Decl. of Brian Lutter in Opp'n to Class Certification, ECF No 185 ("Lutter Decl.") Ex. A; ACC ¶ 49(j).)

KIND also argues that Plaintiffs have not identified the GMO ingredients that are included in KIND bars and why they are GMOs.  First, this argument does not address class certification, but goes to the merits.  As relevant here, whether these bars actually contain GMO ingredients would be true for all of the bars and determined on a classwide basis.  Second, KIND ignores the pleading, where Plaintiffs specifically delineate ingredients that are allegedly derived from non-GMO sources.[5]  (See ACC ¶¶ 33–35, 48.)

---

[5]      The parties spar over whether KIND bars contain GMOs.  But at this stage, the focus is on whether that determination could be made on a classwide basis.  It is worth noting that this action has languished due to inordinate delays in agency rulemaking concerning the terms "All Natural" and "Non-GMO."  In 2015, the FDA signaled its intent to promulgate rules on the use of the term "Natural" on food labels.  See Use of the Term

Finally, KIND attempts to draw distinctions among the different products, namely nut bars, grain bars, and bags of granola.  This is a distinction without a difference because all of the products at issue contained one of the allegedly deceptive labels and GMO and/or non-natural ingredients.

      iii.  <u>Injury</u>

In addition to establishing deception and materiality, Plaintiffs are required to demonstrate injury.  As with the other elements, Plaintiffs are not required to prove injury; rather, they must demonstrate that classwide questions predominate.  Plaintiffs contend that the damages associated with any injury stemming from the allegedly deceptive KIND labels can be measured on a classwide basis.  Specifically, Plaintiffs contend that all putative class members paid a premium for the KIND bars and Healthy Grain Clusters based on KIND's false and misleading advertising.  Moreover, Plaintiffs' expert, Stephen F. Hamilton, Ph.D., asserts that he can quantify this premium.

To satisfy the predominance requirement, Plaintiffs must propose a damages model consistent with their theory of liability.  <u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 33 (2013).  The damages model must measure injury attributable to Plaintiffs' theory of liability; "[i]f the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of 23(b)(3)."  <u>Comcast</u>, 569 U.S. at 33.  Put differently, the damages model must "isolate the premium due only to the allegedly

---

"Natural" in the Labeling of Human Food Products; Request for Information and Comments, 80 Fed. Reg. 69905-01.  On September 16, 2016, this Court stayed Plaintiffs' claims because "the FDA ha[d] initiated proceedings . . . on whether certain products may be labeled as . . . 'All Natural.'"  <u>In re KIND LLC "Healthy & All Natural" Litig.</u>, 209 F. Supp. 3d 689, 696 (S.D.N.Y. 2016).  On February 11, 2019, this Court lifted the stay because "the FDA had exhibited little discernible activity with respect to '[N]atural' rulemaking" and the USDA promulgated rules on the term "Non-GMO," <u>see</u> National Bioengineered Food Disclosure Standard, 83 Fed. Reg. 65814-01.  <u>In re KIND LLC "Healthy & All Natural" Litig.</u>, 2019 WL 542834, at *2 (S.D.N.Y. Feb. 11, 2019) (quotation marks omitted).  To date, the FDA has not issued any guidance for the use of the term "Natural."

misleading marketing statement." <u>In re Scotts</u>, 304 F.R.D. at 413 (collecting cases).  Damages in consumer liability cases are measured by the difference "between what the plaintiff paid and the value of what the plaintiff received." <u>In re POM Wonderful LLC</u>, 2014 WL 1225184, at *3 (C.D. Cal. Mar. 25, 2014).  Plaintiffs must therefore propose damages models that take into account, the value of the product, its deceptive advertising, and the amount they paid for each KIND bar.  <u>See</u> <u>In re Scotts</u>, 304 F.R.D. at 412.

   Plaintiffs' expert—Dr. Hamilton—proposes to use a hedonic regression[6] and a conjoint analysis[7] to ascertain the premium paid as a result of the false advertising.  KIND counters that the variation in labeling means <u>per se</u> that Plaintiffs cannot propose a coherent damages model.  This argument rests on the theory that different variations of the label lead to different premiums.  For example, an individual who purchased a KIND bar with the "All Natural / Non-GMO" label might have a greater injury than a consumer who purchased a KIND bar containing only "Non-GMO."  However, this alone cannot defeat class certification.  First, "[c]ommon issues—such as liability—may be certified, consistent with Rule 23, even where other issues—such as damages—do not lend themselves to classwide proof." <u>Johnson</u>, 780 F.3d at 138–39 (2d Cir. 2015).  Second, the issue here is not whether some class members were damaged while others were not.  Here, all purchasers were exposed to allegedly misleading

---

[6]  A hedonic regression is "a technique used widely by economists to measure the value of product attributes, such as natural or non-GMO attributes, using actual historical retail price data, while controlling for other variables that also influence a product's value such as brand, package size, retail format, geographic location of purchase, and trends in the product category over time."  (Decl. of Stephen F. Hamilton in Supp. Of Mot. To Cert. Class, ECF No. 170 ("Hamilton Decl."), ¶ 19; <u>see also</u> ¶ 20.)

[7]  A conjoint analysis is "a representative survey technique that analyzes consumer responses directly—as opposed to analyzing historical retail prices and the role of product attributes in determining retail prices—to determine consumers' willingness-to-pay for a particular representation made on a product label."  (Hamilton Decl. ¶ 21.)

advertising and therefore may have paid a premium.  Third, the differences among the labels are slight.  Any difference in premium likely will be correspondingly insignificant.

KIND also faults Plaintiffs for failing to ascertain the alleged premium at this stage.  However, nothing in Comcast requires experts to perform their analyses at the class certification stage.  See In re Scotts, 304 F.R.D. at 414.  Instead, "Comcast held that a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury; but the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance."  Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015).  As such, common issues predominate.

### 1. *Daubert*

In addition to arguing that common issues do not predominate, KIND also moves to exclude, under Daubert, Plaintiffs' damages expert, Dr. Hamilton.[8]  (See ECF No. 190.) KIND asserts that his testimony is neither reliable nor relevant and that Dr. Hamilton is not qualified.  Primarily, KIND takes issue with the fact that Dr. Hamilton has not acquired the data or performed the damages analysis.  But KIND puts the cart before the horse.  At the class certification stage, plaintiffs are not required to determine what the damages are—only that damages can be assessed on a classwide basis.  Comcast, 569 U.S. at 33.  Dr. Hamilton does just that.

In his expert report, Dr. Hamilton argues that he can assess the premium paid by members of the class by pinpointing the increased value that KIND's allegedly false advertising created.  (See, e.g., Hamilton Decl. ¶¶ 43–44, 62–64.)  He plans to do this by performing a

---

[8]      KIND needlessly complicated briefing on class certification by injecting this Daubert motion without requesting leave of court as required by this Court's Individual Practice III(A).

hedonic regression analysis and conjoint analysis.  (See Hamilton Decl. ¶¶ 48–61.)  While Dr.

Hamilton had not yet acquired the data necessary to perform his analysis prior to his report, he

opines that such data is readily available.  (See Hamilton Decl. ¶ 51.)

a.  Legal Standard

Rule 702, Fed. R. Evid. Provides that "[a] witness who is qualified as an expert by

knowledge, skill, experience, training, or education may testify in the form of an opinion or

otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the

trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based

on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case."

Rule 702 requires "more than subjective belief or unsupported speculation."

Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590 (1993).  A court must "ensur[e] that an

expert's testimony both rests on a reliable foundation and is relevant to the task at hand."

Daubert, 509 U.S. at 597.  Under Daubert, a court functions as a "gatekeeper" that reviews the

reliability and relevance of an expert's technical, specialized knowledge.  Restivo v. Hessemann,

846 F.3d 547, 575–76 (2d Cir. 2017).  Although the Daubert analysis was initially developed to

examine scientific testimony, it applies with equal force to other types of expert testimony,

including testimony from economists.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147

(1999).

It is generally accepted that the Daubert standard applies at the class certification

stage.  See Tiffany Inc. v. eBay Inc., 600 F.3d 93, 108 (2d Cir. 2010); In re LIBOR-Based Fin.

Instruments Antitrust Litig., 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018).  However, the question

is not whether a jury should be permitted to rely on the expert's testimony, "but rather whether

the Court may utilize an expert's report in deciding whether the requisites of Rule 23 have been met." In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d at 471 (quotation marks omitted) (collecting cases).  Because Plaintiffs proffer Dr. Hamilton as their damages expert, the relevance of his opinions must be assessed against the Rule 23(b)(3)'s predominance requirement.  In short, Plaintiffs' "model supporting [their] damages case must be consistent with [their] liability case." Comcast, 569 U.S. at 35.  Since Plaintiffs bring consumer protection claims, their damages model must attempt to isolate what harm the alleged misrepresentation caused.  See In re Scotts, 304 F.R.D. at 412.

### b.  Reliability

"[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Restivo, 846 F.3d 547 at 577 (quotation marks omitted).  "[T]he district court may consider the gap between the data and the conclusion drawn by the expert from that data, and exclude opinion evidence where the court conclude[s] that there is simply too great an analytical gap between the data and the opinion proffered." Restivo, 846 F.3d at 577 (quotation marks omitted); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."). But gaps and inconsistencies often go to the weight afforded to an expert's opinion and not admissibility.  Dependable Sales & Serv., Inc. v. TrueCar, Inc., 311 F. Supp. 3d 653, 658–59 (S.D.N.Y. 2018) (citing Restivo, 846 F.3d at 577).

KIND launches a barrage of arguments attacking Dr. Hamilton's reliability. KIND argues that Dr. Hamilton's opinions are unreliable because Dr. Hamilton has not used a

hedonic regression and conjoint analysis to determine classwide damages. KIND also argues

that Dr. Hamilton has not even bothered to identify or collect the third-party data he intends to

use. Further, KIND rummages opportunistically through Dr. Hamilton's deposition testimony to

undermine his credibility and challenge his proposed analysis. However, in each of Dr.

Hamilton's answers, he discusses how he will conduct the analysis. (See, e.g., Decl. of Dale J.

Giali in Opp'n to Class Certification, ECF No. 182 ("Giali Decl."), Ex. P, at 37:15–44:14,

48:16–49:18.)

   Notably, "nothing in Comcast requires an expert to perform his analyses at the

class certification stage." In re Scotts, 304 F.R.D. at 414; see also Roach v. T.L. Cannon Corp.,

778 F.3d 401, 407 (2d Cir. 2015) ("Comcast held that a model for determining classwide

damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that

result from the class's asserted theory of injury; but the Court did not hold that proponents of

class certification must rely upon a classwide damages model to demonstrate predominance.").

KIND's arguments are generally better suited for summary judgement than for class

certification. Dr. Hamilton has proposed a method for determining classwide damages.

Contrary to KIND's assertions, he is not required to assess damages at this stage.

   KIND argues that Dr. Hamilton will be unable to separate out the effects that the

allegedly misleading marketing had on price due to collinearity (i.e. "[Dr.] Hamilton will not be

able to evaluate the price premium associated with "All Natural" because that label statement

only appeared with "Non-GMO"). (KIND Mem. of L. in Supp. of Mot. to Strike, ECF No. 191

("KIND Daubert MOL"), at 7.) However, as previously discussed, the differences between the

three variations of KIND labels are minor. Moreover, all three variations are included in the

class.

KIND also takes issue with what it characterizes as Dr. Hamilton's "cursory analysis of the documents underlying this case."  KIND derives this argument from deposition testimony, where Dr. Hamilton testified that he spent three hours reviewing the complaint, thirteen hours reviewing the literature, and twenty-one hours drafting the report.  (See Giali Decl., Ex. P.)  However, KIND ignores the purpose of Dr. Hamilton's assignment: to opine whether a damages model could be created.  As such, it is not surprising that he did not spend as many hours on his report as would be typical of a damages expert at the summary judgment stage.

KIND is also critical of Dr. Hamilton because has not yet identified or acquired the data he will use in his analysis.  However, Dr. Hamilton cured that deficiency by describing the data he plans to use in his reply report.  (See Reply Decl. in Supp. of Class Certification, ECF No. 203 ("Hamilton Reply Decl."), ¶¶ 38–66.)

Finally, KIND argues that Dr. Hamilton's methodology has been rejected by other judges.  But the authorities it relies on are distinguishable.  In Weiner, the court excluded plaintiffs' damages expert because his "bare-bones report provides no details concerning the significant conceptual, implementation, or data issues that would be encountered if his two approaches were adopted."  2010 WL 3119452, at *7.  Moreover, the expert failed to "specify which standard economic methodologies he will use to analyze such data."  Weiner, 2010 WL 3119452, at *7.  Finally, the expert in Weiner did not explain how he planned to "isolate the impact of the 'All Natural' labeling from the other factors that purportedly affect the price of Snapple and its competitors."  2010 WL 3119452, at *7.  Dr. Hamilton's report does not suffer from any of these deficiencies.  It explains in detail how he plans to use a hedonic regression and conjoint analysis to isolate the allegedly deceptive labeling from other unique factors KIND bars

may have.  Moreover, Dr. Hamilton's proposed methodologies are accepted methods employed

to determine pricing premiums.  See, e.g., In re Scotts, 304 F.R.D. at 413 (allowing an expert to

use "a hedonic regression, a contingent valuation study, or a conjoint analysis" to determine the

premium paid due to a false claim).

It is worth noting that courts are split as to whether a conjoint analysis on its own

can adequately isolate a premium price.  Several courts have rejected that methodology.  See,

e.g., In re Gen. Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212, 236 (S.D.N.Y. 2019)

(holding that "conjoint analysis does not provide competent proof of Plaintiffs' damages"); In re

NJOY, Inc. Consumer Class Action Litig., 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015)

(denying class certification because the plaintiffs' proffered conjoint analysis tested only what

consumers were willing to pay "without considering other factors in a functioning marketplace,"

and therefore "[did] not address the fair market value of [defendant]'s e-cigarettes absent the

misrepresentations and omissions."); Apple, Inc. v. Samsung Elecs. Co., 2014 WL 976898, at

*12 (N.D. Cal. Mar. 6, 2014) (rejecting a conjoint analysis because it did "not account for supply

at all, much less the real-world intersection of market demand and market supply, which sets the

real-world market price," leaving the plaintiff without evidence of a price increase).

But a number of courts have admitted conjoint analyses in situations analogous to

the alleged premium in this case.  See, e.g., Price v. L'Oreal USA, Inc., 2018 WL 3869896, at

*11 (S.D.N.Y. Aug. 15, 2018) ("Plaintiffs have satisfied their burden of showing that an

appropriately designed Conjoint Analysis can reliably estimate the economic value to consumers

of the Challenged Claims.").  Because Dr. Hamilton plans to use the conjoint analysis to

reinforce his hedonic regression, this Court need not wade into the debate over reliability of

conjoint analyses at this time.  Accordingly, KIND's motion to exclude Dr. Hamilton's

testimony for lack of reliability is denied.

### c.  Relevance

KIND argues that Dr. Hamilton's testimony is irrelevant because it does not assist

the trier of fact.  This argument largely merges with KIND's arguments about the reliability of

Dr. Hamilton's opinions.  However, the relevance of Dr. Hamilton's testimony is apparent.  The

question for class certification is whether Plaintiffs have proposed a damages model consistent

with their theory (or theories) of liability.  <u>Comcast</u>, 569 U.S. at 33.  Under any reading, Dr.

Hamilton asserts that damages can be measured as a premium which class members paid due to

the false advertising.  (<u>See</u> Hamilton Decl., at ¶¶ 43–44, 62–64.)  As such, his testimony is

relevant.

### d.  Qualifications

In order to admit expert testimony, a court must address "the threshold question of

whether a witness is 'qualified as an expert by knowledge, skill, experience, training, or

education' to render his or her opinions."  <u>Nimely v. City of New York</u>, 414 F.3d 381, 396 n.11

(2d Cir. 2005) (quoting Fed. R. Evid. 702); <u>accord</u> <u>In re Rezulin Prod. Liab. Litig.</u>, 309 F. Supp.

2d 531, 540 (S.D.N.Y. 2004).

KIND argues that Dr. Hamilton is not qualified to opine on conjoint surveys.

While Plaintiffs counter that Dr. Hamilton has nearly a quarter century of experience in the

economic field, (<u>see</u> Hamilton Decl., ¶ 1), they now acknowledge that "Dr. Hamilton [will]

outsource this task and . . . work with a marketing team that actually specializes in conjoint

survey design to conduct a conjoint analysis."  (Pls.' Mem. of L. in Opp'n to Mot. to Strike, ECF

No. 201, at 18.)  But KIND's attack on the conjoint analysis fails for two reasons.  First, for

purposes of class certification, Dr. Hamilton's hedonic regression is sufficient.  Attacking the

conjoint analysis will not defeat class certification.  Second, KIND's argument is not ripe.  Even

if Dr. Hamilton's proposed delegation is improper, Dr. Hamilton has not yet delegated the work.

Rather, Dr. Hamilton has only proposed how he plans to assess damages—all that is required

under Comcast.  As such, disqualification at this stage would be inappropriate.

2.   Objection to Expert Testimony

Doubling down, KIND filed an "objection" to the Reply Declaration of Stephen

F. Hamilton, Ph.D. ("Hamilton Reply Declaration") and the Rebuttal Expert Report of J. Michael

Dennis, Ph.D. ("Dennis Report").  (See ECF No. 211.)  While styled as an "objection," it is a

motion to strike.  And as with its Daubert motion, KIND failed to request a pre-motion

conference.

a.   Hamilton Reply Declaration

KIND seeks to strike the Hamilton Reply Declaration on the grounds that it raises

new arguments and that KIND was not afforded a further opportunity to depose Dr. Hamilton.

Plaintiffs respond that the Hamilton Reply Declaration does not contain any new opinions and

strictly responds to KIND's opposition papers.

The parties exchanged initial expert disclosures on August 15, 2019.  At that time,

Plaintiffs indicated that Dr. Hamilton would be their sole damages expert.  During class

certification briefing, Plaintiffs submitted a supporting declaration by Dr. Hamilton and KIND

deposed him.  During his deposition, Dr. Hamilton had acknowledged that he had not

constructed his damage model or collected the data necessary to build it.  KIND moves to

exclude Dr. Hamilton's testimony, in part, because he had not identified or collected the data he

would need for his damages model.  To cure this defect, Plaintiffs offer a reply declaration where

Dr. Hamilton asserts that he has located the data to perform his damages calculation.  (See Hamilton Reply Decl. ¶¶ 38–66.)

KIND argues that Dr. Hamilton should have done this work as part of his initial report so that KIND could depose him on those efforts.  Plaintiffs argue that Dr. Hamilton offers no new opinions in his Reply Declaration and that he merely responded to KIND's arguments that he would not be able to acquire the necessary data to build his damages model.

Federal Rule of Civil Procedure 26 governs experts and allows expert testimony "intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(ii).  "Rebuttal evidence is properly admissible when it will explain, repel, counteract or disprove the evidence of the adverse party."  Scott v. Chipotle Mexican Grill, Inc., 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (quotation marks omitted).  Thus, "[t]he scope of a rebuttal is limited to the same subject matter encompassed in the opposing party's expert report," and a "rebuttal expert report is not the proper place for presenting new legal arguments, unless presenting those arguments is substantially justified and causes no prejudice."  Scott, 315 F.R.D. at 44.  However, rebuttal experts may rely on new methodologies "for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness."  Park W. Radiology v. CareCore Nat'l LLC, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009).

KIND also claims prejudice.  By submitting the Hamilton Reply Declaration with their reply briefs, Plaintiffs deprived KIND of the opportunity to examine him regarding his reply declaration.  Moreover, the specifics of the data Dr. Hamilton plans to utilize is fertile ground for inquiry.

While KIND demonstrates prejudice, it is minimal.  As the parties advance to summary judgment, Dr. Hamilton will be required to actually build his model and prove

damages.  At that juncture, KIND will have another opportunity for a deposition and <u>Daubert</u> challenge.[9]  Accordingly, KIND's objection is overruled.

### b.   The Dennis Report

On reply, Plaintiffs offered a Rebuttal Expert Report of J. Michael Dennis, Ph.D., (ECF No. 208, ("Dennis Report")).  KIND argues that this Court should strike the Dennis Report because Plaintiffs did not timely disclose Dr. Dennis as an expert.  KIND also assert that Dr. Dennis raises new theories on reply.

On August 15, 2019, KIND disclosed that it retained Dr. Ran Kivetz as a marketing expert.  Rule 26(a)(2)(D)(ii) allows for a party to offer rebuttal expert testimony that is "intended solely to contradict or rebut evidence on the same subject matter identified by another party."  However, Rule 26(a)(2)(D)(ii) offers little refuge for Plaintiffs because it requires disclosure of a rebuttal expert within 30 days.  Plaintiffs did not disclose Dr. Dennis until June 2, 2020, long after that 30-day window expired.

Plaintiffs argue that KIND made an impermissibly narrow initial expert disclosure that failed to disclose that Dr. Kivetz would opine on a merits survey.  But KIND served Plaintiffs with Dr. Kivetz's report on March 6, 2020.  Even crediting Plaintiffs' argument, they waited 90 days to disclose their rebuttal expert witness.  To justify their failure to comply with the 30-day rule, Plaintiffs assert that that the COVID-19 pandemic delayed Dr. Kivetz's deposition.  Plaintiffs argue that they could not determine if they needed a rebuttal expert witness until they deposed Dr. Kivetz.  However, that ignores the fact that Dr. Kivetz's opinions were

---

[9]      Moreover, this Court cannot ignore KIND's failure to follow this Court's Individual Practices.  KIND's infraction was not without effect on the parties and the Court.  Plaintiffs had to draft an opposition to KIND's motion to exclude outside of the pre-set motion schedule.  This Court had to reschedule the oral argument.  By filing it's <u>Daubert</u> motion and objection outside of the Court's Individual Practices, KIND abrogated the schedule fixed by this Court.

detailed in his expert declaration.  Based on Dr. Kivetz's report alone, Plaintiffs could have

determined the need for rebuttal.  Moreover, Plaintiffs could have disclosed their intentions to

retain a new expert prior to Dr. Kivetz's deposition in order to preserve their rebuttal.  Or

Plaintiffs could have sought relief with this Court.  Accordingly, KIND's motion to strike the

Dennis Report is granted.

     b.  <u>Superiority</u>

      In addition to predominance, Rule 23(b)(3) requires "that a class action is superior

to other available methods for fairly and efficiently adjudicating the controversy."  "The

superiority requirement reflects the goal of class actions to achieve economies of time, effort and

expense, and promote uniformity of decision as to persons similarly situated, without sacrificing

procedural fairness."  <u>N.J. Carpenters Health Fund v. DLJ Mortg. Cap., Inc.</u>, 2014 WL 1013835,

at *11 (S.D.N.Y. Mar. 17, 2014) (cleaned up).  A court must consider: "(A) the class members'

interests in individually controlling the prosecution or defense of separate actions; (B) the extent

and nature of any litigation concerning the controversy already begun by or against class

members; (C) the desirability or undesirability of concentrating the litigation of the claims in the

particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P.

23(b)(3).

      All four factors weigh in favor of class certification.  First, given the low cost of

KIND bars and the relative simplicity of consumer protection actions, <u>see</u> <u>Goldemberg</u>, 317

F.R.D. at 397, the possibility of individual interests controlling the prosecution of this action is

remote.  Second, this matter has already been consolidated as part of a multi-district litigation, so

there are no other pending controversies.  Third, the desirability of concentrating this litigation is

apparent given the low cost of the product at issue and the lack of incentive for individuals to

bring suit.  Additionally, this Court has significant experience with this case as a consequence of overseeing the MDL Proceeding.  "Streamlining the litigation in one forum will simplify the process and avoid inconsistency.  Thus, conservation of judicial resources warrants litigating this case as a class action . . . ."  In re Currency Conversion Fee Antitrust Litig., 264 F.R.D. 100, 117 (S.D.N.Y. 2010).  Fourth, any difficulties in managing this class action are vastly outweighed by the benefits.  As such, this Court finds that a class action is superior to any other method of adjudicating this case.

IV.    Rule 23(b)(2)

In addition to certifying classes for monetary damages under Rule 23(b)(3), Plaintiffs seek—under Rule 23(b)(2)—to certify classes to enjoin KIND from using the allegedly deceptive labels.  Specifically, Plaintiffs seek to enjoin KIND from using the "All Natural," "Non-GMO," and "No Genetically Engineered Ingredients" labeling in the future.

Rule 23(b)(2) provides for class certification when "the party opposing the class has refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief."  Fed. R. Civ. P. 23(b)(2).  In order to certify a class under Rule 23(b)(2), a court should, "at a minimum, satisfy itself of the following: (1) even in the absence of a possible monetary recovery, reasonable plaintiffs would bring the suit to obtain the injunctive or declaratory relief sought; and (2) the injunctive or declaratory relief sought would be both reasonably necessary and appropriate were the plaintiffs to succeed on the merits."  Parker v. Time Warner Ent. Co., 331 F.3d 13, 18–19 (2d Cir. 2003).

KIND argues that Plaintiffs are not entitled to class certification under Rule 23(b)(2) because Plaintiffs seek monetary damages that are "incidental" to their claim for injunctive relief.  See Dukes, 564 U.S. at 360 (holding that a Rule 23(b)(2) class cannot be

certified where "the monetary relief is not incidental to the injunctive or declaratory relief").

KIND avers that no reasonable Plaintiff would seek injunctive relief here and that Plaintiffs' only

aim is monetary recovery.

However, Plaintiffs do not seek monetary relief under Rule 23(b)(2).  They only

seek damages through separately certified Rule 23(b)(3) classes.  See, e.g., Sykes v. Mel Harris

& Assocs., LLC, 285 F.R.D. 279, 293 (S.D.N.Y. 2012), aff'd 780 F.3d 70 (2d Cir. 2015) ("That

plaintiffs are seeking substantial monetary damages is of no concern given the Court's

certification of separate Rule 23(b)(2) and (b)(3) classes addressing equitable relief and damages,

respectively.").  Plaintiffs specifically argue that "[a]bsent such relief, KIND admits it is fully

capable of using these misleading labels in the future."  (Pls.' Mem. of L. in Supp. of Class

Certification, at 15.)

Courts in this district have certified injunctive classes for consumer class actions,

notwithstanding certification of additional classes seeking monetary damages.  See, e.g., In re

Amla Litig., 282 F. Supp. 3d 751, 769 (S.D.N.Y. 2017) (certifying a class under Rule 23(b)(2)

despite defendant's argument that "plaintiffs seek substantial, non-incidental monetary relief"

because "plaintiffs do not seek monetary relief under 23(b)(2), only through separately certified

23(b)(3) classes"); Jermyn v. Best Buy Stores, L.P., 256 F.R.D. 418, 434 (S.D.N.Y. 2009)

(same); DeMarco v. Nat'l Collector's Mint, Inc., 229 F.R.D. 73, 81 (S.D.N.Y. 2005) (same).

After this Court heard oral argument on the motion, the Second Circuit decided

Berni v. Barilla S.p.A., where the Court of Appeals addressed the question of whether "a group

of past purchasers of a product [can] maintain a class action for injunctive relief."  964 F.3d 141,

143 (2d Cir. 2020).  The Second Circuit held that past purchasers could not maintain an

injunctive class.  To support its holding, the Court of Appeals reasoned that:

> In the first place, past purchasers are not bound to purchase a product again—meaning that once they become aware they have been deceived, that will often be the last time they will buy that item . . . . But even if they do purchase it again, there is no reason to believe that all, or even most, of the class members will incur a harm anew. Supposing that they have been deceived by the product's packaging once, they will not again be under the illusion that the boxes of the newer pastas are filled in the same way as the boxes of the older pastas. Instead, next time they buy one of the newer pastas, they will be doing so with exactly the level of information that they claim they were owed from the beginning.

Berni, 964 F.3d 141, 147–48.

This case is analogous. Plaintiffs now purport to know that KIND bars are not "All Natural" or "Non-GMO." As such, an injunctive class cannot be sustained. See Campbell v. Whole Foods Mkt. Grp., Inc., 2021 WL 355405, at *16 (S.D.N.Y. Feb. 2, 2021) (finding that Berni precluded an injunctive class as the plaintiff "alleges that had she known the truth about the Product, she would not have purchased it or she would have paid less" because "[s]he now knows the truth").

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' motion to certify the New York, California, and Florida Rule 23(b)(3) damages classes is granted, and Plaintiffs' motion to certify Rule 23(b)(2) injunctive classes is denied. In addition, this Court appoints Amanda Short and Sarah Thomas as the class representatives for the New York Class; Charity Bustamante as the class representative for the California Class; and Elizabeth Livingston as the class representative for the Florida Class. This Court also appoints the law firms of Pearson, Simon, & Warshaw, LLP; Finkelstein, Blankinship, Frei-Pearson & Garber, LLP; and Ahdoot & Wolfson, PC class counsel. KIND's motion to exclude Dr. Hamilton's testimony is denied. KIND's motion to strike Dr. Hamilton's Reply Declaration is denied, and KIND's motion to strike the Dennis

Report is granted.  The Clerk of Court is directed to terminate the motions pending at ECF Nos.

168, 190, and 211.

Dated: March 24, 2021
      New York, New York                    SO ORDERED:

                                    WILLIAM H. PAULEY III
                                    U.S.D.J.